DISTRICT COURT ORDER VACATING THE ARBITRATION AWARD The District Court's order vacating the arbitration award in the underlying matter was error for several reasons. First, under Code of Civil Procedure Section 1286.2, subsection A6a, there is no evidence in the record or otherwise that the arbitrator knew of the ground for disqualification. In other words, the relationship between the Regency and the Bobyeri Productions. I gather it's common ground that we're talking California law, though I'm not sure why. Because the FAA only applies for arbitration agreements made before a dispute, where the arbitration... Well, it doesn't. I mean, in terms it doesn't. I mean, right on its face it says otherwise, which is why I'm a little mystified. But it says on it, it says, let's see if I can find it, a written provision in any maritime transaction involving commerce or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction or refusal. So I'm mystified, but I you all seem happy with this, and I don't know why not. I think it's not in dispute, at least among the parties in the trial court, the district court, that California law applied, I believe, the 9th Circuit. Does it make a difference? Pardon? Does it make any difference? Does it make a difference in this case? I don't believe it makes a difference. I believe the Commonwealth U.S. Supreme Court standards have been adopted by the California Court, so I don't know that it makes a difference. But we are talking about statutory construction, and my understanding is the 9th Circuit has held. Well, the 9th Circuit hasn't held, but it's a district court in Hawaii that's held. That's not the 9th Circuit. Okay. Correct. Correct. In any event, we have all addressed California law. And under that code section, which the California Supreme Court has said is the only basis for vacating an arbitration award, unless one of the five statutory grounds is met for vacating an arbitration award, there's not to be such an outcome. And under 1286.2A6A, which is the subdivision that the district court applied here, failure to disclose within the time required for disclosure a ground for disqualification of which the There is no evidence in the record that the arbitrator was aware of that connection. Now, what do you mean by evidence? You mean direct evidence? Any evidence. Circumstantial evidence? Direct, indirect inference. Circumstantial evidence? Any idiot would have known? I mean, the facts are pretty suggestive that he should have known, and that he did know. I have to say, there's no direct evidence, because he doesn't say, I knew. But it's, you know... Recall the timing. The timing was... Well, yes and no. The six days of hearing had concluded six weeks before. He issued his multi-page award, signed it on July 19th. The testimony when counsel took his deposition was that he joined the new company in mid-July. He didn't provide a precise date. And if somebody joins in mid-July, I noticed this in sort of the back and forth with the district judge when he was asking for a review of the timeline. And the question was whether to use the word take or begin, which verb. And he ended up settling on begin, I think. We all know that you don't sort of walk in off the street and accept the offer of the job and accept the job on the same day. Of course, we don't have on the record how long the negotiations might have gone on. But if he begins the job in mid-July, it's a fairly standard inference that there were discussions about taking that job and he might have even accepted the job sometime before that. For all we know, because he's a lawyer, Bob Yerry Productions was a prior client of his and he just went in-house. We don't know any of that. That's not part of the record. But in any event, important things happened in this arbitration after mid-July, including the damages award. Well, the issue, if you read the arbitration briefs, which are part of the record, there was only one issue in the case, really, and that was did all pictures mean all damages? Yes, but then there was a damages award, and that's what happened after July. It was a calculation. Right. It was a calculation. But he decided on July 19 who won the case. And after that, it was a calculation. Okay. But it was still on. I mean, there were still decisions. We would agree the arbitration was not over, but we had finished six days of trial six weeks later. And so you're saying he announces who wins or loses on the 19th of July. Yes. He might have decided that beforehand, but he announces his decision is made public on the 19th of July. Yes. He begins the job in mid-July, correct? That's what the deposition says. I wasn't there. But do you dispute that? I have no information. In other words, you don't dispute that. You have no evidence with which to dispute it. I have no evidence with which to dispute it. Game's over. Well, let's talk about that because I don't believe that's correct. First, the Supreme Court of California has said the statutory grounds must be met. And the arbitrator had, let's assume that he had been negotiating for two months about this job. That certainly is possible. We don't know. But that does not mean he knew the intricacies of the business of the company he was going to join. The negotiations customarily would involve what his duties would be, what his compensation would be, you know, all those things. Okay. But once he got there, I mean, because as far as I'm concerned, the arbitration was still going on at that point, right? Yes. Once he got there, he was the chief administrative officer, right? That's what he had testified. But he had no duty of inquiry. That's the point of the statute, no duty of inquiry. He had to know. In terms of the inference, the fair inference that Judge Fletcher was suggesting, is it not a fair inference that the chief administrative officer of a company is going to know what the company is doing? I would agree that at some point he must have learned about every deal in the works. But is the fair inference that within four days, let's assume the mid-July is the 15th of July, is it a fair inference that within four days he knows of every single negotiation, contract, deal, that this multifaceted company has made or is considering? I mean, there's a learning curve. Yes, I'm sure at some point he did learn of it. It seems obvious. But to say that he must have known about it on the 19th. You know the problem here is they say in Idaho it doesn't pass the smell test. I want to address that because the smell test is not the right test for an arbitration award. Arbitration is a favored remedy. It's supposed to be speedy. I just can't get an easy one. Well, look, this is something we've been thinking about, and obviously some people have shared that view, including the trial court. But the California Supreme Court has said the litigation is supposed to end with the arbitration award, not continue. And unless one of the five statutory grounds are met, then there cannot be an order vacating the award. And the law in California is under Michael V. Etna, which has been followed. There must be a, when we're talking about a business or personal relationship as a basis for disqualification, it's got to be a substantial relationship involving financial consideration to the arbitrator. And counsel for Nippon has not been able to point to a case, nor am I aware of a case, where someone as an employee, let's assume the arbitrator was involved in this negotiation, even though there's no evidence of that. Let's assume he knew about it. Let's assume he negotiated it for his employer. There is no authority that's been cited where someone in that instance has been found to have that kind of relationship. He wasn't acting for his own benefit. What was in it for him? How does that rise to the level of? Again, these are inferences. It would have been nice if the record were developed better, but if somebody is the chief administrative officer of a production company, one would expect that his financial remuneration in some long-run way is going to be influenced by how much money the company makes. There's nothing in the record to indicate he's an owner, a shareholder, a profit participant. I mean... How large was this company that he signs up with in the sense of how many film projects does it have going at any one time? I know if you go on the Internet and look up Bob Yerry Productions, you have two pages of projects. I know that they're known for the film Crash, which won the Academy Award two years ago. They're an international company. That's not quite my question. How many projects would they have going at any one time? I have no idea, but judging by my knowledge of the industry and comparable companies, they might have 10, 15, 20 projects in development, a smaller number in production, and one or two in principal photography, and some after the fact. This project, at most, would have been considered in development. And how important a project was this going to be? Well, there's no movie that's been made. Yeah. This is a project that New Regency wasn't interested in. That's how it came to them. The way this works is Alexandra Milchen is a producer. She has a deal with New Regency. She's supposed to bring projects to them. They weren't interested in this project. Her agent shopped it around looking for someone to finance it. Apparently, he found Yeri, and they were in negotiation for them to finance this project for her to produce it. As far as I know, it's never gone beyond that. And to suggest that Mr. Immerman had some connection with this, knew about it, negotiated, was going to be involved in it, there's nothing to suggest that. What bearing, if any, does the family relationship have on this? Well, there's no evidence. The two involved people are Alexandra Milchen and Mr. Immerman. Even if they were friends. No, I'm talking about her father. Her father is an executive at New Regency, who is not a witness in the case, not a party, didn't attend. What I'm after is, for practical purposes, this is a small town. And it almost beggars belief that he would not know that this young woman has a film in negotiation with the company he's about to join. Let's assume he knew that. What's his relationship with her? And even if he has a relationship with her, how does that meet the Michael v. Aetna test? We have a series of cases cited where people are referring business back to one another, and the courts of California say that's not sufficient. This is a one-time deal. Even if you assume every possible inference against us, that he knew about it, that he negotiated it, that he personally handled all this for Bob Mary Productions, how is a one-time negotiation a substantial business relationship involving financial consideration to him? That is the test. Now, if the concern is this is some indication of corruption, maybe it's a quid pro quo, there's a separate section for that. But you need some evidence of that. We can't have a circumstance where after arbitrations are concluded, parties can go on the Internet. Should I have been able to go on the Internet if we lost and see if Bob Mary Productions had ever had a film distributed in Japan? Nippon Herald is a major film distributor in Japan. I'm supposed to see if that's going to... Aha! Now we can open up that Pandora's box. This is a circumstance of an industry arbitration where the parties specifically selected this individual because they knew him. And the arbitrator was familiar with the disclosure responsibilities and did his best to attempt to meet them. First of all, he made a disclosure that Mr. Shepard had appeared before him in arbitrations as counsel for a party where Mr. Emmerman had presided as arbitrator. Mr. Shepard said it was only once. The arbitrator thought it was multiple ones. He disclosed that he had negotiated with New Regency executives previous to their joining New Regency. Nippon accepted him, didn't ask any questions. Who, what were the circumstances, wasn't interested because they felt, obviously, they knew him. In the course of the arbitration, he made still another disclosure. He disclosed that his company that he was working for at the time, Crusader, had been sued by Mr. Shepard's firm, that he was going to be a witness in the case, that he was going to be deposed. And, in fact, that's the deposition from which, I believe, they gathered this information. So this was an arbitrator who was aware of his disclosure requirements. And in that regard, it's important to consider something. We are all familiar with the kinds of disclosures that retired judges and arbitrators make at the outset of a matter. You err on the side of disclosing too much. I see so-and-so socially at bar functions. I've seen him a few times at Starbucks. People disclose everything because there's no harm in doing it. But it's a very different matter when an incident comes up after six days of trial. You only are to disclose, at that point, grounds for disqualification because if you disclose, for example, oh, I saw so-and-so at a party last week, the other side has an absolute right to a do-over at that point. They can't say, we don't want to, we don't accept you. So you're only supposed to disclose grounds for disqualification. So the court — Why do you think disclosure is negotiated? Because it's not within the Michael v. Aetna requirements. If he had disclosed it, my view is, and they had a right to disqualify him. When he made an award, it was, what was it, it was well over a million dollars. $1.8 million net. Who got that money? Well, it's not been paid, but it would have been New Regency. It would have been New Regency. And what would his relationship have been with New Regency? There is no evidence of any relationship with New Regency, ever. And New Regency was owned by the daughter. No. The daughter is not an employee, not an owner, not an officer. She has her own — That I understand to be true. I thought she was, but that this deal was, quote, outside her relationship with New Regency. She is a producer who has a production deal with New Regency where if she finds projects, she has to bring them to them first. They can decide if they want to produce them. If they don't want to produce them, they can, if they wish, allow her to shop it around elsewhere. That's her relationship. Not an employee, not an officer, not a shareholder, not an owner, none of those things. There is no evidence in the record that this arbitrator had any relationship with New Regency. But even assuming he had this one-time relationship, that he negotiated and knew about it, under Michael v. Aetna, it has to be a substantial relationship and it has to involve some kind of consideration flowing to him. What I've been looking for so diligently and not finding is I thought there was at least one case, and I don't know whether it's Federal or State, saying that it doesn't matter whether the person knows about it or not. Yes. That is — that was a case relied upon by the arbitrator, International Alliance, versus Laughlin. Oh, I'm sorry. That was the Schmitz case. Right. The Schmitz case — So then it turns out that maybe it does matter whether it's a State or a Federal law. Because you're relying on the State statute as saying there's no duty of inquiry. And if the Federal law is otherwise, then I'm back to my first question, which is on what possible ground does the FAA not cover this? Well, our understanding is, under the Brown v. Hyatt case, that the FAA doesn't apply. But I do want to correct one thing. It was not because it was a matter of Federal law in the Schmitz — in the Schmitz case that there was found to be a duty of inquiry. It's because the rules of the arbitral organization there, the NASD, its rules impose the duty of inquiry. And the statute here, upon which the Court based its decision, specifically does not impose the duty to inquire. So the arbitrator — So your two main positions about why this doesn't apply is because there's no evidence that he knew about it, and because there's no evidence that he had a financial stake. Did no, no relationship, no financial benefit, three. No relationship, meaning no relationship directly? He personally had no relationship in the Regency. His employer did. Mm-hmm. He did not. Mm-hmm. I'd like to reserve, if possible, my last few minutes for rebuttal. Good morning, Your Honors. Charles Shepard, Greenberg, Lusker, Ford, Nippon, Herald. Arbitrators have extraordinary powers. There's limited review over what arbitrators can do, at least the substance of their decisions. And in order to preserve public confidence in arbitrations, we have to make sure that arbitrations are completely above board. Or if I can borrow from Judge Pragerson's observations, we have to make sure that arbitrations and arbitrator impartiality passes the smell test. But it's also true that there's obviously an incentive post hoc to be a lot more otherwise, in the following sense. I mean, if he had disclosed this before anything happened in the case, we don't have any clue about whether you would have recused him or not. By the time, and there's at least some indication you wouldn't have because the whole point of these kinds of arbitrations is to have people who are expert in the industry. And there were some other things he disclosed that did not the hearing, and he may have shown his hand in terms of which way it was leaning. But certainly after the case was over, there are incentives to be a lot more scrutinous. Oh, absolutely. And I think that's just a truism. Anytime somebody moves to vacate an arbitration award, it's because the party is upset with the award that was rendered below. And absolutely correct. We were shocked by this award, given the evidence that was there. And we felt, you know, we thought something was rotten in Denmark, so we conducted an investigation. What should have happened in this case, candidly, is when this arbitrator took a new job in the middle of the arbitration, he should have done two things. He should have told us, hey, wait a minute, guys. I'm no longer a sole practitioner working out of my office in Century City. I am now a senior executive and officer and the chief administrative officer of a motion picture company. At a minimum. I think he probably should have disclosed that, Your Honor. But beyond that, he should have, at a minimum, inquired of his new employer. I'm doing an arbitration. I'm just about to work for you. I've got an arbitration with Nippon Herald and New Regency. Do we have any business dealings with them? Wait a minute. Are you saying that your case depends upon the inquiry? No, absolutely not. Oh, then why did you say he should have inquired as part of your argument? Well, I think as a policy matter, he should have done that. But no, it's not necessary for that. I will observe, however, that there is a district court case which finds specifically that an arbitrator has a duty of inquiry. Assuming for the moment that there's no duty of inquiry. Yes. It's what he happens to know. And assume that unless he knows it, there's no duty to disclose. And it's not a sort of an appearance of impropriety as we, looking from the outside, say, well, if he had known then, but rather he had to know. What's the standard of proof as to whether he knew? Well, you know, of the relationships that they know and so on. The standard that is to be applied to determine whether he had to disclose is whether a person aware of the facts would reasonably entertain a doubt about his impartiality. Yes, but that's not my question. Okay. My question is, what's the standard of proof for us to decide whether he knew? Candidly, I don't know the answer to that because I don't think any case addresses that specifically. I would submit, however, that unlike some of the other cases, including Schmitt's, including Michael, this arbitrator did not submit a declaration denying that he knew about it. In Michael, for example, the arbitrator said, hey, I didn't know about the relationship which the losing party is complaining about. Similarly, in Schmitt's, the arbitrator said, hey, I didn't know about the relationship that you're claiming. In this case, the arbitrator did not submit a declaration to that effect, and I think the inference can reasonably be drawn from that, that he knew, otherwise he would have disclaimed. I think, secondly, as I'm not sure which one of Your Honors mentioned it in the previous argument, but he was the chief administrative officer. He was a senior executive of this company. He wasn't a file clerk, and I think the inference can be drawn that he knew most likely what was going on. This was not a – this was a relatively small company, Yari. It was a – Did anyone ask him? Excuse me? Did anybody ask him the deposition? He was to Polish weapon. Not in this arbitration. He was not deposed. Not in connection with the arbitration. He was deposed in an independent lawsuit that had nothing whatsoever to do with this arbitration. Wouldn't it make sense – wouldn't it make more sense to have some facts here? We actually asked the district court if we could take discovery. When we filed our application to vacate the award, we asked the district court if we could take discovery. And I believe, but I'm not 100 percent certain of this, that the district court had indicated that the reason he denied our opportunity to take discovery, he didn't think we needed it. What if we thought it mattered? Excuse me? What if we thought it mattered? Well, if you thought it mattered, I guess – I guess you could remand it and allow us to take – and order discovery on this, but I don't think that it does matter. I think the – It only doesn't matter if you want to draw this inference, right? Well, the – Do you agree that there's no duty of inquiry? No, I think there was a duty of inquiry. Where are you getting that from? Do you agree that the statute he's relying on is the statute we should be looking at? Not exclusively. I think the – there's no case that addresses – Do you agree that state law rather than federal law applies? I think it doesn't make a difference, Your Honor, to be honest with you. I agree with Mr. Horowitz and the district court judge that the FAA doesn't apply because of – and admittedly, it's just a district court decision. It's just a district court decision. But it's exactly contrary to the statute. Correctly contrary to the statute. Well, it doesn't make a difference. Quite frankly, I'm happy for the FAA to apply. The law is pretty clear, and Judge – Judge Matz made this clear in his comments, that whether you look at the state cases or the federal cases, you get – you get the same answer. And I think that's a good question, and it seems to rely on knowledge. Is that not true? There's actually – that particular statute, 1281.6 – 1286.2A62, talks about the arbitrator's obligation to disclose something which was a grounds of disqualification of which he was aware. But I would suggest that the Michael case itself says that when an arbitrator fails to disclose something that he should have disclosed, that in and of itself constitutes corruption of the arbitrator. Is the Michael case the same statute? It's – the statute's been modified since then. But, yes, essentially, it's – Michael is applying 1286.2, which is the – The same language? I thought it wasn't. I thought there was a difference in the language at that point. I don't think there's a difference in the language as it relates to the grounds to disqualify. There is a difference in the language in the Michael case as to what is required to be disclosed. I think 1286.2, which is the – the statute which talks about vacating arbitration awards, I don't believe that language had – had changed, although the disclosure requirements were – were different. But the point I want to make here is that, in answer to Judge Fletcher's question, based on our record, if there was a knowledge requirement here, the inference can be drawn from two separate circumstances. One, the failure of the arbitrator to submit a declaration denying that he knew. And, secondly, the nature of his position in and of itself. Did he file any declaration? He did not file anything. Was he invited to do so by any party? I don't know. I asked – I thought I did all that I could do, which was to ask the district court to allow me to take discovery, and he did not allow me to do so. I – it's not in the record, but I didn't call the arbitrator and said, hey, I want to – I want to vacate your award, so please cooperate with me and let me know what you – what you did. I don't think he would have responded positively. And do we know anything except what might be inferred as to any conversations they might have had with the arbitrator? Nothing in the record. There's nothing in the record as to – as to that. The record is silent. But the – but – Would it have been inconsistent with the district judge's denial of your request for recovery for them to have supplied a declaration from the arbitrator? I don't think so. I don't think so. They could have submitted whatever showing they wanted – they wanted to make. The district court didn't tell us when he denied the ex parte why he wasn't allowing discovery. And he didn't say, I don't want to hear from the arbitrator, although in retrospect probably he didn't care to hear from the arbitrator. I mean, the district court, I think, is operating, it's pretty clear from his comments, that whether or not Mr. Emmerman knew about the relationship, this was something that needed to be disclosed. And if I might make the following – the following analogy. Let's assume there's an associate in my office, a 10th year associate, who's serving as an arbitrator in a particular – in a particular case. And let's assume between Corporation A and Corporation B. And let's assume that unbeknownst to him, my law firm starts doing work for Corporation A. He doesn't know about it. But then at the end of the day, he renders a $2 million arbitration award in favor of Corporation A, the party that my law firm happens to be representing, even though he doesn't know about it. I think under those circumstances, the award would be set aside because the associate, in this case the arbitrator, didn't reveal something which could cause somebody reasonable doubt as to whether he was in fact impartial. I think it's pretty hard to argue with that – with that situation, even though on my hypothetical, the associate is totally unaware of the representation that's going on, even though the associate is just a salaried employee. He doesn't participate in any of my law firm profits. And that's sort of what we – what is going on here. The inquiry is, when somebody knows the facts, would somebody step back and question, scratch their head and say, gee, I wonder if there was some impropriety here. I wonder if this arbitrator's impartiality was compromised because of the relationship. We don't have to assume – excuse me. I'm sorry. Ginsburg. Looking back at the statute, it seems to me that you might be right prospectively. But retrospectively, the California statute only provides for vacating with regard to matters of which the arbitrator was aware, presumably or perhaps to take care of this sort of retrospective concern. So there may be – there appears to be a statutory difference between the obligation to disclose in the first instance and the grounds for vacating if there's nondisclosure. Is that not a fair reading of the statute? I'm sorry. That there's a difference between what has to be disclosed? Yes. In the first instance, the arbitrator is supposed to disclose, including things he doesn't know. He's supposed to – perhaps it does have a duty of inquiry. But after the fact, in terms of what will be grounds for vacating, the statute specifically says that of which he was aware. And that makes some sense because it takes care to some degree of the concern about, you know, post hoc rationalizations for overturning awards. Well, if Your Honor is thinking about that, I would invite the Court's attention to the Michael case specifically because the Michael case says that when – it is an arbitration case. And it's CCP section 1286.2, subsection A2, I believe, which talks about corruption of the arbitrator. And the Michael case – and I'll read the relevant language to the Court – says that – Can you give me a page side as you read? Yes. This is on Michael. Well, this is the issue of whether or not you can disqualify an arbitrator for failure to disclose something that he was required to disclose, independent of whether he knew about it or not. It's at page 937 of the Michael case. We now hold that where an appraiser or arbitrator fails to disclose matters required to be disclosed by section 1281.9, subsection E, and a party later discovers that disclosure should have been made, that failure to disclose constitutes one form of corruption for purposes of section 1286.2, subdivision B, and thus provides a ground for vacating an award. So with respect to Judge Berzon's point, doesn't subsection A6.2 require knowledge? I'm not sure that it does. But even if it does, you can still vacate pursuant to subsection B because Michael expressly says that when an arbitrator doesn't disclose something that should be disclosed, you can vacate. This is very confusing because the statutes keep changing. Yes. Looking at 1286.2B now, it doesn't say anything like that. Let me just get the statute. It says petitions to vacate an arbitration award pursuant to section 1285 are subject to provisions of 127.8. That's what it says. So I don't know if the statute changed or what. I don't believe the statute's changed in that regard, Your Honor. 1286. There is a corruption provision. That's what I was going to do. It's a different number. Correct. Yes, that's correct. There's a corruption provision. Now, what Michael says. What is that language in Michael? I can't seem to find it. It's on the bottom of page 937. How far from the end of the opinion? It's head note 7 in the version that I have. It looks to be about halfway through the opinion. Are you just reading the head notes? No, no, no. I'm reading directly from the case. I read from page 937. It's under subsection E. The title of the section is The Failure to Disclose Facts. And three paragraphs down is the language that I referred to. Now, I'm reading 1281.9 sub E, which the court in Michael tells us is the controlling language. And it's quoted in footnote 5 of Michael. And it says, in relevant part, section 1281.9 subdivision E now states, an arbitrator shall disclose to all parties the existence of any grounds specified in section 170.1 for disqualification of a judge in the sense grounds exist shall disqualify upon demand. That doesn't say anything one way or the other about what the arbitrator has to know. That is to say, shall disclose what he knows without inquiry. Shall disclose after due diligence. Shall disclose what any damn fool would have known. It just doesn't say. It just says shall disclose. I think that's correct. The point I was trying to the reason I raised this point to Michael was to respond to Judge Berzon's point that subdivision A6 seemed to require some sort of knowledge. And I said, even if you assume that to be the case, you can independently vacate the award based upon corruption. Well, only if the corruption includes matters of which he was not aware, which seems like a strange way to talk. Which Michael didn't address because there was no such problem with Michael. I understand. And so it's a strange form of corruption to say somebody didn't disclose something he didn't know about. Well, except. Strange use of the word corruption at a minimum. That's correct. But the, again, I go back to the fact that if he wanted to tell us he didn't know about it, he should have told us that. The inference can be drawn that he did know about it because of the nature of his job. So who is the he? The he is the arbitrator? The arbitrator wasn't in the case. I mean, he was not going to come wandering in and tell anybody anything. The arbitrator is not a party to this lawsuit. That's correct. That's correct. But then it makes it very difficult, then, to vacate arbitration awards on these grounds. No. It just may be that Judge Matz just went a little too fast and that we need to have some information. Well, respectfully, I would disagree with that because I think what — and I'd like to address the standard of review, if I may, because the standard of review, I think, in this case is clearly erroneous. And the illegal standard to be applied is, was there information that a reasonable person or a person aware of the facts could they have reasonably drawn the inference that the arbitrator's bias or the arbitrator was impartial. I mean, that's the standard which — Can I ask a procedural question? Have you participated in mediation in this Court about this case? It strikes me that perhaps that would make some sense at this point, especially if we had any concern about the facts rather than starting doing more procedures. Did the mediators contact you? Did you consider mediation? Well, there — we certainly would. There was a — we were contacted early on in the case. This, of course, goes beyond the record. I'm sorry. I certainly would, but I must say, historically, New Regency has been saying, hey, I've got a $2 million reward. I'll ask on this one. But I think what the relevant legal standard in all of these cases is it doesn't make a difference whether the arbitrator knew or didn't know. And if you look at the Schmitz case, Schmitz is a case where the arbitrator did not know about the so-called disqualifying information. In the Schmitz case, there was an arbitrator. He did not know that his law firm's — Schmitz ultimately says there are circumstances in which you may have to disclose even though you don't know, but they seem to rely in part on the NASD and in part on the fact that it was a lawyer and had ethical obligations. So there seemed to be — they didn't say always. They said sometimes. That's correct, although I would invite the Court's attention to a case which we cited in the proceedings below, but I don't think it's in our briefs now. It's a district court case, admittedly, but it's pretty much on point. It's a case of HSMV Corp. v. ADI Ltd., 72F sub second 1122. And in that specific case — Where was the case from? Central District, California. Who was the judge? I believe it was Judge Collins, but don't hold me to that, Your Honor. But in that — We need to find the case. Okay. Judge Collins. I think it was Judge Collins. In any event, in that particular case, the Court specifically talked about duties of inquiry under the international arbitration rules. And if I can just quote from page 1129 of that, admittedly, district court case, the Court concludes that the disclosure requirement imposed by both rules — and that was referring both to the international arbitration rules, which are at issue here. It was also talking about some United Nations rules as well. But the Court concludes that the disclosure requirement imposed by both rules necessarily implicates a duty to investigate whether instances of potential conflict exist. Now, of course, that case is not binding on this Court, but I think it's well-reasoned. And I think it's a question of sound policy. Let me ask you this. You said that we review the district judge's findings here for clear error. And, of course, that is the standard rule for findings of fact. But I read through Judge Matz's oral statements for the record, which were pretty thorough, and I might have missed it, but did he make any finding of fact explicit on the record that the arbitrator knew of the relationship? No, I don't think he did that, Your Honor. I don't think he did that. So if knowledge is required, actual knowledge, not just should-have-known knowledge, but actual knowledge, we don't have something to which we have to give that sort of clear error factual finding deference? If actual knowledge is required, then the Court hasn't — the Court didn't address that issue. That's correct. But, again, I don't think that actual knowledge is required because the Schmitz case makes it clear that it's not required. The district court case, which I just cited — The Schmitz case doesn't make that clear. The Schmitz case, as I said, makes it fuzzy. I'm sorry? The Schmitz case makes it fuzzy. Respectfully, Schmitz case was — it was undisputed in Schmitz that the arbitrator didn't know about the — As I said, the fact — it relied on specific factors which are not present here. That's correct. It's an NASD arbitration. Also that he was a lawyer. That is correct. I don't know if the arbitrator here was a lawyer, but I assume he wasn't. In our case, yes, the arbitrator was a lawyer. But in any event, it seems to me that even if you were to find actual knowledge where required, I think the inference can be drawn given the nature of the position which the arbitrator held. And I think — We don't really know. We don't know how big the company was, really. We don't really know what the nature of his position was. And we don't know whether he was an administrator, meaning, you know, running the office, or whether he was an administrator, meaning running the company. We don't really know that. Well, we do. We know a little bit. We do know that he was in charge of the legal department and the business affairs department of Yari. We do know that he was involved in production of motion pictures because he testified in the deposition in the other case that his duties involved coordinating with the production department of the company. But I — One last question, because your time is over. We've been talking about the duty disclosure issue. What about the other issue that — I guess there were two other issues that were stressed, but one of them was that he had — there's no evidence that he had a personal financial state. What about that? Or that he was personally involved with New Regency? You know, the language which they cite, they cite the Michael case for that language. And I'm sorry I'm out of time, but that language in Michael is just dicta. That is not a holding of the case. That is loose language. It wasn't relied on by the court. No court cites that language since. And it cannot be the case, I would respectfully submit, that that is a criteria because — go back to the analogy I gave about an associate in my office serving as an arbitrator. He doesn't have a financial stake in any other work that my office does, but if my office is representing an arbitrating party and he's the arbitrator, I think that requires disclosure, notwithstanding the fact that he doesn't receive money. And I would respectfully submit that whether Yarry is a partnership and Mr. Yarry is a corporation and he's an officer, that kind of distinction should not be relevant in determining what the disclosure requirements are. I mean, the disclosure requirements are such that we want to have people to be confident that there wasn't something fishy going on in the arbitration. And if there was something fishy going on in the arbitration, then the law is pretty clear, both Federal court, State court, whether you apply the FAA, whether you apply Section 6 or Subsection 2, the Corruption Statute of 1286.2. When that occurs, arbitration awards are set aside. And I respectfully submit — and I know I'm using up my time here. Your bottom line is that given the arbitrator's position, his work as a lawyer, his representation of the company, his position that he assumes that arbitration is over, that he just had to know of this relationship. That's basically what you're saying. Well, Your Honor, that's half of my argument. I would suggest that it defies credulity that he didn't know. But even if he didn't know, the overall circumstances of the case could lead somebody reasonably aware of the facts to entertain a doubt that he — Yeah, but there is something very rankling about overturning a vacation — vacating an arbitration award where the arbitrator essentially didn't do anything wrong, appearances aside, because he didn't, in fact, know. And, you know, it's one thing to say that you're going to overturn an arbitration award because the arbitrator did something he shouldn't have done. But if he wasn't, in fact, influenced by anything and he didn't know, we're just spinning wheels to be overturning an arbitration award and making everybody go start over again. Well, I don't think so, Your Honor, because the thrust of all of these cases is, can somebody standing back, looking at the overall panoply of events, scratch their heads and question whether or not there might not have been some compromise of the arbitrator's impartiality? Well, if he didn't know, why would there be a compromise? Well, because as Judge Prager said, it doesn't smell right. You're in the middle. That's different. I mean, then it's because we don't know whether he knows. We may not believe what he says is really what you're saying. You're saying if he says he doesn't know, we're not going to believe him. Well, that's another issue. I mean, if what Your Honor is thinking about, at least conceptually, and I hope we don't go there, but if Your Honor — If he didn't know, there's no affidavit to that effect. There's no affidavit to that effect. That's correct. And I think you should have submitted one. But if he really has a relationship with this company, and we go back there and we take his deposition, for example, you know, then what happens? If he says, I don't know, maybe that testimony itself may be compromised because of the relationship. I mean, I think we create a slippery slope if we say, let's go back. Let's depose the arbitrator. Let's ask the arbitrator if he knew. The arbitrator is still in business with New Regency. He's really got a motivation to — and I don't mean to discredit the arbitrator at all, but he does have some motivation to make sure that this arbitration award remains intact because he wants to curry favor with New Regency. To put it independently of this individual, if we're just talking generally what the law ought to be, you can make your point without respect to this particular arbitrator. Someone in his position will be reluctant to say, yes, I knew this highly relevant information, which would have required my disqualification, but I didn't do that. That's not human nature to say that's exactly true. Absolutely correct, Your Honor. And that's why I think the place where Judge Berzon may at least tentatively be thinking about going, I think, is a place we don't want to go. And that's because — Well, if knowledge is required, how are we going to get it, except by asking him? Well, except that I don't think that knowledge is required for the reasons I've said. And I think one of the — and this will be the last comment I make because I know I've overstayed my welcome. But one of the things that we haven't really talked about, but we don't have to establish bias. And when we start talking about what did he know, what did he actually know, I think those are the types of issues that we should be focusing on if the inquiry is, was this man actually biased? How do we know if this man was actually biased unless we know first whether or not he knew about the underlying relationship? And, of course, you can't establish actual bias unless you know. But I would submit, and the cases are crystal clear on this, Schmitz particularly, but California cases as well, you don't have to establish actual bias in order to vacate an arbitration award. And I'd respectfully submit that all of the questions about did he have to know are these issues that he had to be able to know. Kagan. What he knew and whether he was biased are not the same thing. Excuse me? Whether he knew and whether he was biased are not the same thing. No, no. I understand that. But I think the issue of whether he knew was an issue that is much more relevant when you're trying to establish that he's actually biased. What we're trying to establish is if you look at the overall scheme of things here, somebody could reasonably question, and that's the legal standard, somebody could reasonably question whether his, objectively, reasonably question whether or not his impartiality was compromised. And if you can question it, all you have to do is objectively and reasonably question it, and the law is crystal clear in California and in the state courts that you have to vacate. And it's unfortunate that we have to go back and re-arbitrate a case. But going back to the first comment I made, because arbitrators have so much power, we have to put a premium on arbitrator impartiality. And because those powers are so great, we have to require a concomitant avoidance of any impropriety. And I respectfully submit that Judge Nats had it absolutely right. This thing needs to be set aside. We need to start over again. And I appreciate the Court's time. Unless you have any further questions. Thank you. Thank you. I want to respond briefly to my mediation question. The parties did consult with the Court's representative who concluded mediation. Would you be willing to do it now? I'm always willing to talk. Well, to address counsel's points, I think you are being asked to disregard, if not override, a California statute. You can read from any of the cases that you want about an arbitrator's duty to disclose, but that's not the issue. The issue is, is there a statutory ground? What if we think Federal law applies? Then I request that the parties have an opportunity to brief it. Because no one has considered it. No one has briefed it. Do you have any response at all to why the district court, we should follow a district court of a white case, which says something about the statute that is just painfully not so? Perhaps it's because the parties agreed California law applied. So you think there's a stipulation that California law applies? Well, I don't know that we've signed a stipulation, but we argued and agreed and the Court agreed with us. So basically you'd say, I mean, that's a reasonable position. You're saying, you're basically saying, you know, we've litigated it this way and it doesn't matter whether it's right or wrong. And that was the same issue on Dutch law. We all arbitrated on the basis of California law, and we haven't addressed that, I think, for good reason, because it's not a point well taken. But to go back to the point I was making, the issue is, is one of the statutory requirements for vacating an award satisfied here, and that statutory provision requires knowledge. There is no evidence one way or the other on that. And it was a bit of a reasonable impression of bias. Well, this is not an actual bias case. This is a disclosure case. They have not attempted to show bias, nor is there any evidence of bias. It's a disclosure case. And the question is, was there a ground for disqualification of which he was aware that he was required to but did not disclose? Yes. Now, you say there's no evidence. That, of course, is wrong. There's circumstantial evidence, and you want to say, you know, with some plausibility, the circumstantial evidence is not enough to rise to the standard of proof by which we should conclude that he did have it. But it's not that there's no evidence. Well, I – on the issue of knowledge, I submit there is no evidence. We can say maybe he should have known, but that's not evidence that he did know. Okay. Well, we can agree to disagree on that.  And your view is the one that counts. Well, but that doesn't necessarily mean you win it. Win or you lose. It's just what constitutes circumstantial evidence is distinct from no evidence, but it doesn't – Right. Let me ask you this. Your adversary has made some point of the fact you've submitted no declaration from the arbitrator. Do you have any response to that? Yes. They deposed him and either did or didn't ask the – They deposed him? They deposed him, not me. But not in this case. In the other case, and they've submitted that. So I don't know what they asked and didn't ask. But I do know it's –  Describe to me the other case. I mean, so why would this have come up or not come up in the other case? That is the matter where the arbitrator disclosed he had been sued by the firm and they were going to depose him, and they apparently asked him about his employment background, and they submitted a partial transcript as part of the record here. And when did that deposition take place? After the arbitration was concluded. In this case? After the arbitration was concluded in this case? Yes. But the issue in that case, I gather, wasn't whether it was a different issue. Probably not. I don't know. I don't know anything about the case. Why shouldn't they have been accorded discovery when they asked for it in this case? Well, reading Judge Matz's mind, it's because you don't want to, after an arbitration, have people litigate again all these issues. The point of arbitration is finality. Did you oppose discovery? I don't recall. I might well have. I mean, it was not our intent to litigate this issue. I will tell you, we have not had any contact with the arbitrator, no communications, no written note. I have no idea what his involvement was or wasn't. We don't even know if he knows anything about any of this. Right. And I would put this in perspective. Mr. Rimmerman is a lawyer. I don't think we'd be here today if Bob Gary Productions had been a client of his and he wasn't asked to work on this negotiation. None of us would be arguing that that's improper or should have been disclosed just because he's the lawyer for someone that has a relationship with a party. The question is, did he have something to do with it? And I don't think that changes if he moves in-house or is representing them outside of being in-house. This may or may not prove to be relevant. Let me ask you again, now that you've had a chance to reflect. You do or do not remember whether you opposed the discovery request by the other side? I do not recall, but it's probably likely that we did. But I don't remember where in the process it was. And were you actually in front of Judge Matz at my recollection as I read the transcript that you were? The discovery issue was done by an ex parte application before the hearing. Okay. But obviously we can look in the record and find out what your position was. Right. And, you know, I think it might make some sense, frankly, if you're going to remand it or consider remanding it. We should find out. What is the relationship? Does he have any benefit? Did he get involved in any of this? Did he know about it? Those are relevant facts. But, you know, frankly, my experience is it's unethical for me to contact Mr. Emmerman and talk to him. I haven't had a communication with him of any sort since the final hearing. I don't think you're going to have discovery in the lawsuit. So by opposing it, you basically made, you know, created or helped to support at least a situation in which we know less than when we can know more. I don't know. So we therefore have to draw an inference. We either have to, in order for you to prevail, we either have to hold that there is no duty of inquiry or, no, that there was a duty of inquiry or that we can assume that he, we can draw an inference that he knew, one or the other. Is that right? Among the other requirements. I don't personally think knowledge is the end of it. I don't, again. But you also think there has to be an individual financial requirement. I think he has to have. It's his relationship that counts, not someone else's. But that someone else, when you're talking about a chief administrative officer and high-level executive of a company, seems like an artificial decision. But you have to consider the cases. Michael v. Aetna, the appraiser, the arbitrator in that matter, had worked twice before for one of the parties. Hadn't disclosed it. Obviously, he knew about it. Court said, we're not, we're going to overturn the lower court's order vacating because it was not a substantial business relationship. Just the current, for one thing, which this one is. I mean, this one, if he actually knew, then what we have is a situation where he was negotiating. We don't know that. I'm saying if he knew. If he knew. If he knew and if he was negotiating. We don't know. No, I'm sorry. Negotiating for his job is what I mean. Oh, for his job. Yes. In which he was negotiating for a job with a company who would be advantaged if New Regents, if a principal of New Regents or a relative of the principal of New Regency, somebody who worked with New Regency was advantaged. And also, I gather that this property, the film, was the property of New Regency before it was taken over by Yarris. There must have been negotiations going on between Yarris and New Regency. Yes. So he, if you look at that scenario, he had, especially before he was employed, even more than when he was employed, but before he was employed, he had a financial advantage in promoting New Regency and its relationship. One could speculate that he was bribed. I mean, we can speculate as to all kinds of things, but in the real world, is he going to sit down and say, you know what, you might want to pay me some more because I have this arbitration and, you know, I can get them to give you. I'm not going to do that and I wasn't suggesting that. No, but that's. I'm saying that there are lots of incentives floating around depending how the facts turn out, quite aside from what he says about whether he knew or didn't know. I am interested in knowing what the facts are, and obviously I think a remand for discovery would make some sense. If you're interested in knowing what the facts are, this sounds as though you've only become interested recently. Well, that's true, because at the end of an arbitration, that should be the end of it. Truly, I don't know what the facts are. I just know what's in the record. But doesn't Judge Matz in his decision answer these questions? On these issues, it doesn't. He had undisputed facts before him. He did not make any factual findings because it was an undisputed factual record and there was nothing about knowledge, nothing about Mr. Emmerman's involvement, nothing about whether Mr. Emmerman had any benefit, potential or actual. None of that was part of the record and not in dispute before him. And he was operating on the legal theory that it didn't matter. So the question is whether we think it matters. Yes, and the judge unfortunately misconstrued Michael, thinking that Michael had come down the opposite way he had. He thought that Michael had supported vacating the ward when it was the opposite. He doesn't make too many mistakes. No, he's a very good judge. Yes. Thank you. Thank you. Mobile oil. Thank you.
judges: Pregerson, W. Fletcher, Berzon